UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FARID F. SHAFIK,<br>    *Plaintiff*,<br><br>vs.<br><br>ASTON MARTIN LAGONDA OF NORTH AMERICA, INC., ASTON SAN DIEGO LLC (D/B/A, ASTON MARTIN SAN DIEGO), MILLER MOTOR CARS, INC (D/B/A, ASTON MARTIN GREENWICH),<br>    *Defendants*. | No. 3:23-cv-00207-MPS |

## RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.    INTRODUCTION**

This case arises out of a three-year lease for a 2019 Aston Martin DB11 vehicle. Farid F. Shafik, proceeding *pro se*, brings breach of warranty claims under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq*., and a claim under Connecticut's Lemon Law, Conn Gen. Stat. § 42-179, *et seq*., against Defendants Aston Martin Lagonda North America, Inc. ("AMLNA"), Miller Motorcar, Inc. ("Miller"), and Aston San Diego LLC ("ASD"). Defendants move for summary judgment on the breach of warranty claims.[1] For the reasons explained below, I conclude that Defendants are entitled to judgment as a matter of law on these claims.

**II.    FACTS**

---

[1] Defendant Aston Marton Lagonda Global Holdings PLC ("AMLGH") joined this motion for summary judgment and raised separate arguments regarding Shafik's Lemon Law claim. I have since dismissed without prejudice all claims against AMLGH for failure to perfect service, however, ECF No. 192, and so need not address the claims against AMLGH.

1

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits. All facts are undisputed unless otherwise indicated.[2]

### A. The Parties and Lease

Farid F. Shafik is a resident of Southington, Connecticut. ECF No. 145 ¶ 1; ECF No. 148 ¶ 1. On October 1, 2019, he entered into a three-year lease agreement with Defendant ASD for a new 2019 Aston Martin DB11 vehicle. ECF No. 145 ¶¶ 2, 5; ECF No. 148 ¶¶ 2, 5. Plaintiff engaged in lease negotiations with ASD from his residence in Connecticut. ECF No. 145 ¶ 3; ECF No. 148 ¶ 3. The car was transported from California to Connecticut, ECF No. 145 ¶ 4;

---

[2] The Local Rules of this Court require each party to present its version of the facts "in an orderly and structured manner that is designed to allow a judge to ascertain what facts are settled and what facts are in dispute." *Chimney v. Quiros*, 3:21-cv-00321, 2023 WL 2043290, at *1 (D. Conn. Feb. 16, 2023). First, the party moving for summary judgment must file an enumerated statement of facts accompanied by specific citations to supporting evidence—the Local Rule 56(a)1 Statement—along with the cited admissible evidence supporting each individual statement of fact. *See* D. Conn. L. Civ. R. 56(a)1, 3. Then, the party opposing summary judgment must submit a responsive statement—the Local Rule 56(a)2 Statement—containing separately numbered paragraphs corresponding to the paragraphs set forth in the moving party's Local Rule 56(a)1 Statement and indicating whether he admits or denies the facts set forth by the moving party in each paragraph. D. Conn. L. Civ. R. 56(a)2. Each denial in the Local Rule 56(a)2 Statement must include specific citations to admissible evidence supporting the statement or denial, D. Conn. L. Civ. R. 56(a)3, such as an affidavit that has been "sworn to before an officer authorized to administer oaths, such as a notary public," or "an unsworn declaration, which is dated and signed by the declarant 'under penalty of perjury,' and verified as 'true and correct,'" *Lamoureux v. AnazaoHealth Corp.*, No. 3:03-cv-01382, 2010 WL 3801611, at *1 (D. Conn. Sept. 22, 2010). The non-moving party is also required to submit a separate section in his Local Rule 56(a)2 Statement entitled "Additional Material Facts," listing any additional material facts not included in the moving party's Local Rule 56(a)1 Statement that he contends "establish genuine issues of material fact precluding judgment in favor of the moving party." D. Conn. L. Civ. R. 56(a)2. These additional facts must likewise be followed by specific citations. D. Conn. L. Civ. R. 56(a)3.

Shafik has failed to comply with these requirements. Many of the "objections" in his Local Rule 56(a)2 Statement do not actually contradict Defendants' contentions, *see, e.g., id.* ¶¶ 38, 40, and many of his "Additional Material Fact" statements are not relevant to the present motion, *see, e.g., id.* at 17 ¶ 2, 18-19 ¶ 12. Further, many of the assertions in this submission lack valid supporting citations. In some instances, his objections do not contain any citations. *See, e.g.,* ECF No. 148 ¶¶ 37, 45-46, 60. In others, the cited sources do not support the assertion or objection being made, *see, e.g., id.* ¶¶ 46, 66; *id.* at 17 ¶ 3, or are not competent evidence, *see, e.g., id.* 18 ¶ 8. I have done my best to decipher Shafik's submission, but I cannot consider statements not supported by evidence and am "under no obligation to perform an independent review of the record to find proof of a factual dispute if the non-moving party fails to designate specific facts showing a genuine dispute of material fact," *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (internal quotation marks and alterations omitted). Although Shafik is representing himself, Defendants specifically warned him of these requirements. ECF No. 144.

Defendants have also filed a response to Shafik's disputed issues of material fact submission. ECF No. 155. Such a response is not permitted by the Court's Local Rules, and I have not considered it.

ECF No. 148 ¶ 4, and subsequently registered in Connecticut, ECF No. 145 ¶ 6; ECF No. 145-1 at 30.³

AMLNA is the North American distributor of Aston Martin vehicles. ECF No. 145 ¶ 9.⁴ Aston Martin vehicles, including 2019 DB11 vehicles, are accompanied by a "New Vehicle Limited Warranty," an express written warranty that is issued by AMLNA. *Id.* ¶ 10.

Miller is a dealership that is authorized by Aston Martin to perform service and repairs to Aston Martin vehicles under the New Vehicle Limited Warranty. ECF No. 145 ¶ 16; ECF No. 148 ¶ 16. Shafik's vehicle was taken to Miller for service on three occasions over the course of the three-year lease term. ECF No. 145 ¶ 15; ECF No. 148 ¶ 15.⁵

**B. The New Limited Vehicle Warranty**

According to Shafik, he was not given access to the New Vehicle Limited Warranty prior to the execution of the lease. ECF No. 148 at 17. But, at the time of delivery, he understood that

---

³ Shafik notes that "[i]t is NOT established that ASD had authorization or registration to do business in the State of Connecticut, or legal ability to contract with Plaintiff." ECF No. 148 ¶ 5. He further contends that "ASD charged Plaintiff, amongst other things, to procure and secure a registration on his behalf to operate the vehicle in accordance with the law," but that "[r]egistration was not provided with the vehicle" and "was not effectuated until December 4, 2019." *Id.* ¶ 6. But Shafik does not explain, and it is not apparent to the Court, how these allegations relate to the claims at issue in the present motion.

⁴ Shafik takes issue with Defendants' reliance on the declaration of Simon Andrew (ECF No. 145-7) because "[Defendants] failed to notify Plaintiff of Mr. Andrew's participation and role in this case," and "Plaintiff was not given an opportunity to depose Mr. Andrew." ECF No. 148 ¶ 9. Shafik does not offer any evidence in support of these contentions. Even assuming they are true, however, Defendants cite the Andrew's declaration in support of three fairly general assertions, which Shafik does not directly dispute (and implicitly or explicitly concedes in other portions of his submission) and which are not essential to this ruling. *See* ECF No. 145 ¶ 9 ("Defendant Aston Martin Lagonda North America, Inc. ('AMLNA') is the North American distributor of Aston Martin vehicles."); *id.* ¶ 10 ("Aston Martin vehicles, including 2019 DB11 vehicles, are accompanied by an express written warranty (the 'New Vehicle Limited Warranty' or the 'Warranty') that is issued by AMLNA."); *id.* ¶ 16 ("Miller is a dealership authorized by Aston Martin to perform service and repairs to Aston Martin vehicles under its New Vehicle Limited Warranty").

⁵ The parties dispute various facts regarding AMLGH. ECF No. 145 ¶¶ 74-75; ECF No. 148 ¶¶ 74-75. I need not consider these statements or any arguments regarding AMLGH, however, as I have dismissed without prejudice all claims against AMLGH for failure to prove proper service. *See* ECF No. 192.

3

the vehicle was covered by a manufacturer's warranty and came with an owner's manual that described the terms of the warranty. ECF No. 145 ¶¶ 7-8; ECF No. 148 ¶ 7-8.

The New Vehicle Limited Warranty commences on the date of the vehicle's first retail sale and provides coverage for three years. ECF No. 145 ¶ 11; ECF No. 148 ¶ 11. It states, in relevant part:

> **3.1 Warranty Maintenance**
>
> Aston Martin warrants that during the Warranty Period, if an Aston Martin vehicle is correctly operated and maintained by the user in accordance with the Maintenance chapter of the Owner's Guide, repairs required to correct defects in materials or workmanship will be performed without charge; any component covered by this Warranty found to be defective in materials or workmanship, will be repaired, or replaced, without charge. Your Aston Martin Dealer will repair the vehicle with genuine Aston Martin parts.

ECF No. 145 ¶ 12; ECF No. 148 ¶ 12. It also includes the following limitations:

> **2.1 Warranty Limitations**
>
> This New Vehicle Limited Warranty is the only express Warranty applicable to your vehicle. Aston Martin neither assumes, nor authorizes anyone to assume for it, any other obligation or liability in connection with this Warranty. No person, including Aston Martin employees or Dealers, can modify or waive any part of this warranty
>
> **a) Limitation of Remedies**
>
> Under this Warranty, it is agreed that the sole exclusive remedy against Aston Martin and its authorized Dealers shall be for the repair or replacement of defective parts as provided herein. The sole purpose of this exclusive remedy shall be to provide for the free repair and replacement of defective parts in the manner prescribed in this Warranty.
>
> This exclusive remedy shall not be deemed to have failed its essential purpose so long as Aston Martin, through its authorized Dealers, is willing and able to repair or replace defective parts in the prescribed manner.
>
> Aston Martin and its Dealers are not responsible to you for any time or income that you lose, any inconvenience you might be caused, the loss of your

>transportation or use of your vehicle, the cost of rental vehicles, fuel, telephone, travel, meals or lodging, the loss of personal or commercial property, the loss of revenue, or for any other incidental or consequential damages you may have.
>
>…
>
>Aston Martin shall not be liable for any damages caused by delay in delivery or furnishing of any products and/or services.

ECF No. 145 ¶ 13; ECF No. 148 ¶ 13. The warranty further notes that Aston Martin dealers may perform customer satisfaction campaigns involving necessary service procedures, at the dealers' cost, and that these repairs are separate from those covered by the express warranty. ECF No. 145 ¶ 14; ECF No. 148 ¶ 14.

### C. Shafik's Vehicle Repairs

#### 1. May 2020

Shafik first brought his car to Miller for service on May 6, 2020 because the airbag light had illuminated. No. 145 ¶ 20; ECF No. 148 ¶ 20. Richard Borowiec, an automative technician at Miller, determined that there were uneven resistance (electrical current) levels in the passenger airbag. ECF No. 145 ¶¶ 17, 21; ECF No. 148 ¶¶ 17, 21. He sought technical assistance from Craig Newton, an AMLNA employee, through Aston Martin's "Spotlight" system. ECF No. 145 ¶ 22; ECF No. 148 ¶ 22. After making some initial adjustments, Borowiec was unable to replicate the uneven resistance condition.[6] ECF No. 145 ¶ 24; ECF No. 148 ¶ 24. Aston Martin nonetheless recommended replacing the "passenger airbag assembly." ECF No. 145 ¶ 25; ECF No. 148 ¶ 25. A component from the United Kingdom was needed in order to perform that repair. ECF No. 145 ¶ 26; ECF No. 148 ¶ 26. Miller ordered that component and, after it was

---

[6] I understand this to mean that Borowiec could no longer detect uneven resistance levels at that point.

delivered, Borowiec installed it, tested the vehicle, and verified that there was no further need for concern. ECF No. 145 ¶ 27; ECF No. 148 ¶ 27.

During this vehicle service, Miller also performed service campaign "QN-01-1280/SA-01-1280," a preventative repair to replace the vehicle's convertible roof pump due to concerns over its "short life." ECF No. 145 ¶¶ 30-31; ECF No. 148 ¶¶ 30-31. The roof pump was operable and had not failed at the time of repair, and Shafik does not recall having communicated any complaints to Miller about the convertible roof. ECF No. 145 ¶¶ 32-33; ECF No. 148 ¶¶ 32-33.

Also during this repair, Borowiec examined the airbag for "loose mounting units." ECF No. 145 ¶ 35; ECF No. 148 ¶ 35. There were recall campaigns relating to this issue in effect at the time. ECF No. 145 ¶¶ 37-38; ECF No. 148 ¶¶ 37-38. These recalls did not apply to Shafik's vehicle, but Newton asked Borowiec to ensure that the safety recall condition was not present. ECF No. 145 ¶¶ 37-38; ECF No. 148 ¶¶ 37-38. Borowiec confirmed that it was not. ECF No. 145 ¶ 36; ECF No. 148 ¶ 36.

All of these repairs were provided under the New Limited Vehicle Warranty. ECF No. 145 ¶ 39; ECF No. 148 ¶ 39. The repaired vehicle was returned to Shafik, at which point the airbag light was no longer illuminated. ECF No. 145 ¶ 28; ECF No. 148 ¶ 28. Shafik had no further concerns related to the airbag light at this time. ECF No. 145 ¶ 28; ECF No. 148 ¶ 28. Shafik is not aware of the passenger airbag malfunctioning at any point after this repair visit. ECF No. 145 ¶ 29; ECF No. 148 ¶ 29.[7] And he did not complain about the roof pump for the rest of the lease term. ECF No. 145 ¶ 34; ECF No. 148 ¶ 34.

---

[7] Shafik contends that "the airbag light came on again," but the repair order to which he cites in support of this assertion is dated July 27, 2022. ECF No. 148 ¶ 28; ECF No. 56-1 at 25. He has not raised a genuine dispute of fact

6

Shafik drove the car at least once or twice per week for at least a year after these repairs were made. ECF No. 145 ¶¶ 40-41; ECF No. 148 ¶¶ 40-41.[8] Shafik was not aware of any mechanical issues with the car during this time, ECF No. 145 ¶ 42; ECF No. 148 ¶ 42, but, according to Shafik, he limited his use of the vehicle because he was afraid to drive it. *Id.*

### 2. May 2022

Shafik's vehicle was brought to Miller again on approximately May 10, 2022. ECF No. 145 ¶ 43; ECF No. 148 ¶ 43. Shafik complained that the car had failed to start. ECF No. 145 ¶ 43; ECF No. 148 ¶ 43. Borowiec, relying once again on technical assistance from the Spotlight system, checked the vehicle's fuses and related connections and performed other tests and diagnostics. ECF No. 145 ¶¶ 44-45; ECF No. 148 ¶¶ 44-45. Miller replaced the "electronic steering lock" module, the "electric ignition switch" module, and the vehicle's battery. ECF No. 145 ¶ 46; ECF No. 148 ¶ 46. These replacements caused the steering and airbag fault lights to illuminate, so the new modules had to be recoded. ECF No. 145 ¶ 47; ECF No. 148 ¶ 47.

On the same service date, Miller performed "Campaign SA-30-1571" to address a potential issue with the vehicle's parking sensors. ECF No. 145 ¶ 50; ECF No. 148 ¶ 50. Shafik had not complained of any issues with the vehicle's parking sensors before the campaign was performed. ECF No. 145 ¶ 51; ECF No. 148 ¶ 51.

Once again, these repairs were provided under the New Vehicle Limited Warranty; Shafik did not pay for any of them. ECF No. 145 ¶¶ 53-54; ECF No. 148 ¶¶ 53-54. Shafik did

---

as to whether there were any issues with the airbag light when the car was returned to him after these May 2020 repairs.

[8] Defendants make two, somewhat conflicting contentions regarding how often Shafik drove the vehicle after these repairs, which appear to reflect Shafik's contradictory testimony on the topic. ECF No. 145 ¶ 40 ("After the vehicle was returned to Plaintiff from Miller, he estimated that he drove it about once or twice a week."); *id.* ¶ 45 ("At Plaintiff's earlier deposition on May 13, 2021, he testified that he drove the vehicle three to four times a week after this repair, depending on the weather.").

not have any issues with the parking sensors following these repairs. ECF No. 145 ¶ 52; ECF No. 148 ¶ 52. And he does not recall having subsequent experiences with or concerns about the car failing to start. ECF No. 145 ¶ 49; ECF No. 148 ¶ 49.

### 3. July 2022

The vehicle was brought to Miller for a third time on July 13, 2022. ECF No. 145 ¶ 55; ECF No. 148 ¶ 55. Shafik complained that the electric buttons on the steering wheel did not work and that the airbag warning light was illuminated. ECF No. 145 ¶ 56; ECF No. 148 ¶ 56. Miller identified a "steering wheel to switch pad fault" and removed the "steering wheel airbag, paddle shifter, and steering column control module" to inspect the wiring. ECF No. 145 ¶ 57; ECF No. 148 ¶ 57.

These repairs did not clear the fault, so Miller requested assistance through the Spotlight system. ECF No. 145 ¶ 58; ECF No. 148 ¶ 58. At Spotlight's direction, Miller performed additional tests and checks and then replaced the steering column control module and steering wheel electronic control unit. ECF No. 145 ¶ 59; ECF No. 148 ¶ 59. Though the airbag warning light had been illuminated, this repair did not involve a failure in the vehicle's airbag system. ECF No. 145 ¶ 60; ECF No. 148 ¶ 60.

At this same visit, Shafik complained that he could not start the vehicle with one of his "black keys"—the electronic keys that came with the vehicle. ECF No. 145 ¶¶ 65, 67; ECF No. 148 ¶ 65, 67. The second black key did not exhibit this problem. ECF No. 145 ¶ 67; ECF No. 148 ¶ 67. Miller determined that the black key had been programmed but not initialized after the new ignition module was installed during Shafik's May 2022 visit. ECF No. 145 ¶ 66; ECF No. 148 ¶ 66.

Shafik also complained that the car's "easy entry/exit feature" was not working because the seat was not moving. ECF No. 145 ¶ 69; ECF No. 148 ¶ 69. Miller explained to Shafik that the seat was not supposed to move and that the feature was working properly. ECF No. 145 ¶ 70; ECF No. 148 ¶ 70. It provided Shafik with instructions regarding the design of that vehicle feature. ECF No. 145 ¶ 70; ECF No. 148 ¶ 70.

As with the other two visits, Shafik did not pay for any of these services. ECF No. 145 ¶ 71; ECF No. 148 ¶ 71. When the car was returned to Shafik, the airbag light had turned off and the steering wheel buttons and black key functioned properly. ECF No. 145 ¶¶ 61, 63, 68; ECF No. 148 ¶¶ 61, 63, 68. And Shafik did not experience other issues relating to an illuminated airbag light or the steering wheel buttons or paddles through the end of the lease term. ECF No. 145 ¶¶ 62, 64; ECF No. 148 ¶¶ 62, 64.

Shafik returned the vehicle on October 8, 2022, at the end of the three-year lease term. ECF No. 145 ¶ 72; ECF No. 148 ¶ 72.

### III. LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d

Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## IV. DISCUSSION

Shafik brings two claims under the MMWA: (1) breach of express warranty under Conn. Gen. Stat. § 42a-2-313 and (2) breach of the implied warranty of merchantability under Conn. Gen. Stat. §§ 42a-2-314 to -316.[9] As explained below, I grant Defendants' motion for summary judgment as to both of these claims.

### A. Breach of Express Warranty

Defendants contend that Shafik's breach of express warranty claim fails because Conn. Gen. Stat. § 42a-2-313 does not apply to the New Vehicle Limited Warranty. I agree.

In *Napoli-Bosse v. General Motors LLC*, I examined whether a "repair-and-replace" vehicle warranty—that is, a warranty that provides for repairs to correct vehicle defects—was an "express warranty" within the meaning of § 42a-2-313. 453 F. Supp. 3d 536, 544-46 (D. Conn. 2020). I concluded that it was not. *Id.* Though the Connecticut Supreme Court still has yet to

---

[9] Defendants' contention that the MMWA "is not an independent cause of action" is wrong. ECF No. 143-1 at 10. The MMWA "creates a cause of action for certain consumer claims of breach of warranty or breach of contract." *Poriss v. Gene Langan Volkswagen of Connecticut, Inc.*, No. 3:15-CV-01837 (JAM), 2016 WL 1271460, at *2 (D. Conn. Mar. 31, 2016). Such claims do, however, "stand or fall with the express and implied warranty claims under state law." *Vita v. Gen. Motors, LLC*, No. 20CV1032JMAARL, 2023 WL 2970049, at *11 (E.D.N.Y. Feb. 27, 2023). Shafik brought his MMWA claims "pursuant to" Connecticut law, *see* ECF No. 56 at 2; ECF No. 149 at 1, and Defendants agree that Connecticut law governs these claims, ECF No. 143-1 at 9. I will thus evaluate whether Shafik has viable claims under these Connecticut statutes.

rule on this issue, at least one state trial court has cited my opinion favorably. *See Makris v. BMW of N. Am., LLC*, No. HHD CV-22-6158753-S, 2024 WL 1403663, at *3, *3 n.1 (Conn. Super. Ct. Mar. 27, 2024) ("Connecticut case law is clear that a warranty for the repair and replacement of parts for a good is generally not a warranty for future performance.").

Like the warranty at issue in *Napoli-Bosse*, the New Vehicle Limited Warranty in this case is a "repair-and-replace" warranty: it "promis[es] only to repair any defects," and does not "guarantee[] the absence of any defects." 453 F. Supp. 3d at 544. Specifically, the New Vehicle Limited Warranty provides for "repairs required to correct defects in materials or workmanship," and states that its "sole purpose…[is] to provide for the free repair and replacement of defective parts." ECF No. 145 ¶¶ 12-13; ECF No. 148 ¶¶ 12-13. Shafik does not attempt to distinguish *Napoli-Bosse* or dispute that the warranty's scope was so limited. *See* ECF No. 147 at 8-9; ECF No. 148 ¶¶ 12-14 (noting that "Plaintiff does not dispute the written materials," *i.e.*, the warranty language set forth in Defendants' Local Rule 56(a)1 Statement). I conclude that the New Vehicle Limited Warranty is likewise not an "express warranty" within the meaning of § 42a-2-313.

Because § 42a-2-313 does not apply to this warranty, I need not consider whether the warranty was in fact breached by Defendants. Defendants are entitled to summary judgment on this claim.

### B. Breach of the Implied Warranty of Merchantability

As to Shafik's breach of implied warranty claim, Defendants contend that there is no genuine dispute that the vehicle was merchantable when sold. Once again, I agree.

"To state a claim for breach of the implied warranty of merchantability, a party must plead that: 1) a merchant sold the goods; 2) the goods were defective and not merchantable at the

11

time of sale; 3) injury occurred to the buyer or his property; 4) the injury was caused by the merchant's defective product; and 5) notice was given to the seller of the claimed breach*." Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418, 445 (D. Conn. 2021) (internal quotation marks and alterations omitted). To be "merchantable," goods must, among other things, "pass without objection in the trade under the contract description," be "fit for the ordinary purposes for which such goods are used," and "run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved." Conn. Gen. Stat. § 42a-2-314(2). "[I]f the product conforms to the quality of other brands on the market, it will normally be merchantable." *Zito v. United Techs. Corp.*, 673 F. App'x 117, 121 (2d Cir. 2016) (internal quotation marks omitted).

  Here, Shafik contends that the various "defects, malfunctions, mis-adjustments, and/or nonconformities" for which the car was serviced during the lease term are evidence that the car was not merchantable. ECF No. 56 at 15; ECF No. 147 at 10. I am not convinced that these defects were sufficiently serious to render the car unmerchantable. *See Zito,* 673 F. App'x at 121 ("A product may fall considerably short of perfection, and yet be merchantable."). Even if they were, however, Shafik has not presented any evidence indicating that these defects existed when the lease was entered into or when he took possession of the vehicle—in other words, he has not created a genuine dispute of fact as to whether the car was unmerchantable "at the time of sale…or when [it] le[ft] the [defendants'] control." *Criscuolo v. Mauro Motors, Inc*., 58 Conn. App. 537, 546 (2000). Shafik's first complaint—regarding an illuminated airbag light—was made in May 2020, more than seven months after the lease commenced. He has presented no evidence that the airbag light was illuminated at the time of sale or delivery or that the underlying issue existed before the light turned on. And he does not dispute that the other repairs

12

and tests performed during that visit were either preventative or precautionary. Shafik's subsequent service visits occurred more than two years later, in May and July 2022. As with the car's earlier repairs, he has presented no evidence that the issues addressed during these visits existed before May 2022.

Because there is no genuine dispute as to whether the car was merchantable at the time of sale, no reasonable factfinder could conclude that Defendants breached the implied warranty of merchantability. I need not address whether this claim fails as to some Defendants for lack of privity or whether Shafik established damages supportive of this claim.

## V.  CONCLUSION

In sum, I grant Defendants' motion for partial summary judgment. Shafik's breach of express warranty and breach of implied warranty claims under the MMWA are dismissed as to all Defendants.

*    *    *

Because these were Shafik's only federal claims, a question arises about whether I still have subject matter jurisdiction over this case. "[F]ederal courts are courts of limited jurisdiction," and may hear cases only where a federal question exists ("federal question jurisdiction") or there is diversity of the parties ("diversity jurisdiction"). *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation marks omitted); 28 U.S.C. §§ 1331-32. Because Plaintiff's only remaining claim is under Connecticut's Lemon Law, Conn Gen. Stat. § 42-179, *et seq.*—a state law—I no longer have federal question jurisdiction under 28 U.S.C. § 1331. I can entertain this claim only if the

allegations in Plaintiff's complaint or other evidence in the record[10] show that "at the time the present action was commenced there was diversity jurisdiction" under 28 U.S.C. § 1332. *Dupont*, 565 F.3d at 63. Specifically, Plaintiff must establish that, at the time this case was filed, he was "a citizen of—i.e., domiciled in—a state other than the state[s]" in which Defendants are domiciled. *Id.* (internal quotation marks and citations omitted). Plaintiff bears the burden of proving that diversity jurisdiction exists. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Within **fourteen (14) days** of this order, Plaintiff shall file a statement no longer than five (5) pages, double-spaced, pointing to allegations in the complaint or other evidence in the record, or attaching any supplemental evidence related to the question of citizenship of the parties, that show that he was not, when this case was first filed, a citizen of the same state as any of the Defendants. I note specifically that Plaintiff alleges that he is a "resident" of Connecticut and lists Connecticut addresses for AMLNA and Miller, both of which are described as being corporations. *See* ECF No. 56 at 1-2. Corporations are citizens of each state in which they are incorporated and of the state in which they have their principal place of business. *See* 28 U.S.C. § 1332(c)(1). If AMLNA's or Miller's principal place of business is in Connecticut (or if either is incorporated in Connecticut) and Plaintiff is a citizen of Connecticut, then there is not complete diversity between the parties and I cannot exercise jurisdiction over this case. In that event, I would have to dismiss the remaining state law claim without prejudice to Plaintiff bringing that claim in state court.

                                              IT IS SO ORDERED.

---

[10] "Diversity jurisdiction may be established based on the record as whole, including supplemental affidavits, despite the fact that a complaint may not adequately state requisite facts to satisfy 28 U.S.C. § 1332." *Celadon v. Home Depot, U.S.A., Inc.*, No. 3:09CV404 HBF, 2010 WL 5360889, at *3 (D. Conn. Dec. 20, 2010).

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
       March 12, 2025